**Roxie Gail SORRELLS, Plaintiff,**

v.

**SUN LIFE ASSURANCE COMPANY OF CANADA, Defendant.**

**No. Civ.A. 2:98–0920–RV–S.**

United States District Court, S.D. Alabama, Northern Division.

Feb. 16, 2000.

James B. McNeill Jr., Selma, AL, for Plaintiff.

James S. Christie Jr., Thomas M. Miller, Bradley Arant Rose & White, LLP, Birmingham, AL, for Defendant.

## ORDER

VOLLMER, District Judge.

This matter is before the court on the following documents:

1. "Motion for Summary Judgment," (doc. 26), filed by defendant Sun Life Assurance Company of Canada, together with a supporting memorandum, (doc. 27), evidentiary material, (doc. 28), and proposed findings of fact and conclusions of law as required by Local Rule 7.2.(a);

2. Response, (doc. 31), filed by plaintiff Roxie Gail Sorrells, together with evidentiary material, (doc. 32), and response to defendant's proposed findings and conclusions (doc. 30);

3. Reply, (doc. 34), filed by defendant;

4. "Motion to Strike Affidavit of Randy Pugh," (doc. 33), filed by defendant; and

5. The parties' "Joint Pretrial Document."

After due consideration, the court finds that no genuine issue of material fact exists and that defendant is entitled to summary judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56. Accordingly, it is

**ORDERED that the motion for summary judgment is GRANTED. The court finds that the following facts are undisputed and makes the following conclusions of law.**

## UNDISPUTED FACTS[1]

1. The primary issue in this case is whether plaintiff is entitled to accidental death benefits under an employee welfare benefit plan covered by the Employee Retirement Income Security Act of 1974 (ERISA). 29 U.S.C. §§ 1001–1461. (Pretrial Doc., p. 3).[2]

2. At the time of his death, Ricky Carl Sorrells was an employee of All–Lock Company, Inc., (All–Lock), and a participant in All–Lock's employee welfare benefit plan. (the Plan). The Plan benefits at issue were funded by Mr. Sorrells' employer through the purchase of a group life insurance policy (No.24888) (the Policy) from defendant Sun Life. The Policy included life insurance and accidental death and dismemberment (AD & D) insurance benefits. (*Id.*).

20. A summary of the Policy (the Policy Summary) was prepared by defendant and distributed to the All–Lock employees, including Mr. Sorrells.[3]

---

**1.** Most of these undisputed facts are taken from the "Uncontested Facts" section in the parties' Joint Pretrial Document.

**2.** As defined by ERISA,

The term[ ] "employee welfare benefit plan" ... mean[s] any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1).

**3.** Title 29 U.S.C. § 1102(a)(1) states in part that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." Although it is not clear from the record, it appears that All–Lock intended to comply with § 1102(a)(1)'s written instrument requirement through four documents (the Policy, the Policy Summary, All–Lock's application to Sun Life for the Policy, and the "Administrator's Guide"). The court notes that there is no other document in the record which satisfies § 1102(a)(1)'s written instrument requirement. The court also notes that it is also not clear whether All–Lock offered its employees other welfare benefits (in which defendant Sun Life played no part) and/or pension benefits. If All–Lock offered either of these additional benefits, then it would be incorrect to define the Plan as consisting of solely of the Policy, the Policy Summary, the Policy application, and the Administrator's Guide. However, without evidence from the parties that All–Lock provided such additional benefits, the court will assume there were none and that the Plan is limited to the Policy, the Policy Summary, the Policy application, and the Administrator's Guide.

As a related matter, the court notes that 29 U.S.C. § 1022(a) requires "a summary plan description" of the employee welfare benefit plan to "be furnished to participants and beneficiaries." It appears that the "policy summary," (Franklin Jancura 2d aff., exh. B), was intended to (and does) function as the "plan summary" or "summary plan description" required by 29 U.S.C. § 1022(a), (Jancura depo., pp. 20–21; Barbara Howard aff., p. 2, ¶ 9), and the court will use the term *"Plan Summary"* interchangeably with the term *"Policy* Summary." *C.f. Alday v. Container Corp. of America,* 906 F.2d 660, 662 n. 2 (11th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 ("Apparently, [the employer's] formal written document [required by 29 U.S.C. § 1102(a)(1) ] and the SPD [summary plan document] [required by 29 U.S.C. § 1022(a) ] were identical.").

4. As part of the Plan, defendant prepared and issued to All–Lock the "Administrator's Guide." (Barbara Howard aff., exh. B, p. GA–1). As established in the Administrator's Guide and Ms. Howard's affidavit, All–Lock is the Plan's Administrator, and Ms. Howard is the All–Lock employee "in charge of the administration of the plan." (Admin. Guide, p. GA–1; Howard aff., p. 2, ¶ 8).

3. On the night of August 15, 1996, Mr. Sorrells was involved in a single-car accident in Selma, Alabama. He died at a hospital 3½ hours after the accident as a result of injuries he sustained in that accident. (Joint Pret. Doc., pp. 3 & 5; Sorrells' Death Certificate, Franklin Jancura depo., exh. W).

4. Mr. Sorrells' beneficiary, plaintiff Roxie Gail Sorrells, submitted claims to All–Lock under the Plan for life insurance and AD & D insurance benefits. (Joint Pret. Doc., p. 3).

5. All–Lock approved both claims ($41,000 for life insurance and $41,000 for AD & D insurance) and passed the claims on to defendant. (Howard aff., ¶¶ 10, 11, & 12).

6. Defendant approved plaintiff's life insurance benefits claim and paid plaintiff the full life insurance benefit ($41,000). (Joint Pret. Doc., p. 3).

7. As to the AD & D insurance benefits claim, defendant requested and received additional information, including Mr. Sorrells' autopsy results and a report of the toxicology test(s) performed on Mr. Sorrells at the hospital following the accident. (*Id.*, p. 5). The autopsy results and toxicology report were provided to defendant by plaintiff's attorney. (*Id.*).

8. The toxicology report, issued by the Alabama Department of Forensic Sciences, Auburn Division, states that Mr. Sorrells' ante-mortem blood alcohol content was .23 percent ethyl alcohol.[4] (*Id.;* Tox.Rep., Jancura depo., exh. P). This amount is nearly three times the legal limit for operating a motor vehicle in Alabama. ALA. CODE § 32–5A–191(a)(1) ("A person shall not drive or be in actual physical control of any vehicle while ... [t]here is 0.08 percent or more by weight of alcohol in his or her blood.").

9. Defendant also considered the official Uniform Traffic Accident Report.[5] In

---

Section 1022(a) also requires that the summary plan description contain specific information identified in § 1022(b) and to "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." The Plan Summary plays an important part of the Plan for two reasons. First, ERISA requires that the Plan Summary be given to each participant and beneficiary; it does not require that the participants and beneficiaries be given the actual policy. Second, the Plan Summary controls over the actual policy to the extent that the two documents differ, provided that the participant or beneficiary can prove reasonable reliance on the Plan Summary. *See McKnight v. Southern Life and Health Ins. Co.,* 758 F.2d 1566, 1570 (11th Cir.1985) ("It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document, and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonably relying on the summary booklet."); *Branch v. G. Bernd Co.,* 955 F.2d 1574, 1579 (11th Cir.

1992) ("We thus hold that, to prevent an employer from enforcing the terms of a plan that are inconsistent with those of the plan summary, a beneficiary must prove reliance on the summary.").

4. The toxicology report also states that Mr. Sorrells' ante-mortem blood drug content was .9 mg/L phenobarbital. Defendant's ultimate denial of AD & D benefits was not predicated on the presence of phenobarbital in the deceased's blood—probably because, as plaintiff suggests, the phenobarbital was likely administered to Mr. Sorrells by medical personnel at the hospital to provide pain relief from his injuries. *See* Plf's Resp., p. 9 (doc. 31). The presence of the phenobarbital was not a basis for defendant's denial of the AD & D benefits, and no further discussion of the point is warranted.

5. The parties refer to this report as the "police report." However, the accident was investigated, and the report prepared, by an Alabama state trooper—making the term "police report" a misnomer in this case.

that report, the investigating trooper stated that Mr. Sorrells' vehicle ran off the two-lane, county road onto the right shoulder, returned to the roadway, overturned (apparently overturning only once), and continued across the oncoming lane (it appears that there was no oncoming traffic at the time of the accident), before coming to a rest on the left shoulder of the roadway with Mr. Sorrells partially ejected from the vehicle. (Acc.Rep., Jancura depo., exh. X).[6],[7]

10. In completing the standard accident report form, the investigating trooper noted that: the road surface was asphalt, there were no contributing road defects, the conditions were dry, there was nothing to obscure Mr. Sorrells' vision, there were no materials in the roadway contributing to the accident, the accident did not occur in or relate to a road construction zone, the accident occurred in a level curve in the two-lane roadway which was marked as a no passing zone.

11. The trooper indicated that, in his opinion, alcohol and drugs were a factor in the accident. In the "Prime Contributing Factor" box, the trooper listed "Driver Not in Control." In the "Other Contributing Circumstance" box, the trooper listed "DUI"; he did not list "Driver Condition" as a "Other Contributing Circumstance."[8] In the "Driver Condition" box, the trooper selected "No Defect" and did not select "Apparently Asleep," "Fatigued," "Ill," "Other," and "Unknown." Finally, the trooper indicated that Mr. Sorrells was traveling 60 mph in a 45 mph zone.[9]

12. Defendant denied plaintiff's claim for AD & D benefits, asserting that (1) Mr.

Sorrells' death was reasonably foreseeable under the circumstances and was thus not "accidental" as defined by the Policy and (2) that Mr. Sorrells' death resulted from his drunk driving, an illegal act under Alabama law and was thus excepted from coverage by the terms of the Policy.

13. The Policy provides, in relevant part, that defendant will pay AD & D insurance benefits when an employee "sustains an **Accidental Bodily Injury** while insured, which results in loss of life, sight, or limb within 365 days of the date of that injury." (The Policy, p. 25) (bold added). The Policy Summary contains a practically identical provision. (The Policy Summary, p. 21).[10]

14. The Policy's AD & D insurance benefits "Definitions" section provides that: "**Accidental Bodily Injury** means bodily harm caused solely by external, violent and accidental means which is sustained directly and independently of all other causes." (The Policy, p. 12) (bold in original). The Policy Summary contains an identical definition. (The Policy Summary, p. 47).

15. Defendant's obligation to pay AD & D insurance benefits is subject to a number of exclusions, the following being the only one upon which defendant based its denial of benefits in this case: "Payment will not be made for a loss which is due to or results from ... committing or attempting to commit and assault, felony or other illegal act." (The Policy, p. 26). The Policy Summary contains a practically identical provision. (The Policy Summary, pp. 22–23).

---

6. The accident report indicates that Mr. Sorrells was not wearing either a lap belt or a shoulder belt at the time of the accident.

7. In his affidavit, Randy Pugh (who lives near the accident scene and responded when he heard the accident) states that Mr. Sorrells was pinned underneath his vehicle. *See* footnote 21.

8. The "Other Contributing Circumstance" box has 36 options from which the investigating officer may select.

9. The record does not disclose how the trooper reached the conclusion that Mr. Sorrells was driving 60 mph at the time of the accident. Presumably, the trooper came up with the speed figure based on his observations during the accident investigation; however, the record does not disclose whether the trooper is an accident reconstruction expert.

10. *See* footnote 3 and accompanying text.

16. The Policy requires that written "Notice" of a claim for AD & D insurance benefits due to a death be given to defendant within a certain time period and that a "Proof of Claim" for such benefits be given to defendant within a certain time period. (The Policy, p. 49).[11] The Policy Summary contains identical provisions. (The Policy Summary, pp. 37–38).

17. The Policy also contains the following "Claims Provisions":

"Sun Life may require as part of the Proof, authorizations to obtain medical and non-medical information." (The Policy, p. 50);

"Proof must be satisfactory to Sun Life." (The Policy, p. 50);

"When Sun Life receives satisfactory Proof of Claim, benefits payable under this Policy will be paid for any period for which Sun Life is liable." (The Policy, p. 50).

The Policy Summary contains identical and practically identical provisions. (The Policy Summary, pp. 38–39).

18. The Policy's life insurance benefits section contains the following provisions:

"Sun Life has the right to designate a Physician to examine the Employee when and as often as may be reasonably required." (The Policy, p. 20);

"Sun Life will pay an Accelerated Benefit to the Employee at the Employer's request, if Sun Life receives satisfactory Certification of the Employee's Terminal Illness." (The Policy, p. 20);

"Sun Life may confirm the diagnosis of a Terminal Illness with a medical examination performed by a Physician of Sun Life's choice." (The Policy, p. 21).

The Policy Summary contains the following provisions: "If Sun Life receives satisfactory Certification that you are Terminally Ill, part of your Life Insurance may be payable to you while you are still living." (The Policy Summary, p. 14).

19. The Policy's "General Policy Provisions" section contains the following provision:

"The records which, in the opinion of Sun Life, are material to the insurance, will be opened for inspection by Sun Life at any reasonable time." (The Policy, p. 47);

The Policy Summary does not contain this provision.

20. The Policy's "General Policy Provisions" section also contains the following provisions:

"Sun Life, at its own expense, has the right to have any person, whose Injury or Sickness is the basis of a claim:

1. examined by a Physician, other health professional or vocational expert of its choice; and/or

2. interviewed by an authorized Sun Life representative. This right may be used as often as reasonably required." (The Policy, p. 47);

"Sun Life has the right, in the case of death, to request an autopsy where not prohibited by law." (The Policy, p. 47).

The Policy Summary contains identical provisions. (The Policy Summary, p. 41).

18. The Admin. Guide contains the following provisions:

"As the plan administrator of your company's group insurance, some of your responsibilities may include:

\*    \*    \*    \*    \*    \*

Submitting claims or instructing employees on claims procedures.\*" (Admin.Guide, p. GA–1) (\*note omitted);

"In addition, it is your responsibility to: Obtain prior approval from Sun Life for any written material produced describing your Sun Life group insurance policy (ies) or Sun Life's role in your benefits plan." (Admin.Guide, p. GA–1).

## CONCLUSIONS OF LAW

### I. Jurisdiction and Venue

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b).

---

**11.** Plaintiff complied with all of the time requirements.

## II. Legal Standard for Summary Judgment

As the Court of Appeals for the Eleventh Circuit has cogently explained:

> Summary judgment is proper in cases in which there is no genuine issue of material fact. Fed.R.Civ.P. 56(c).... [The court] must view all of the evidence in the light most favorable to the non-moving party. *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988). The movant bears the initial burden of presenting evidence sufficient to demonstrate the absence of a genuine issue of material fact. *Celotex Co. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When the movant has met its burden, the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 593–94 (11th Cir.1995).

*Southern Solvents, Inc. v. New Hampshire Insur. Co.,* 91 F.3d 102, 104 (11th Cir. 1996).

## III. Legal Standard for Review of the Denial of AD & D Benefits Claim

The first issue to be resolved is the determination of which legal standard this court should employ in its review of defendant's denial of plaintiff's benefits claim.

Plaintiff asserts that this court must take a *de novo* review of the benefits deni-

al because, *citing Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989), and *Moon v. American Home Assurance Co.,* 888 F.2d 86, 88 (11th Cir.1989), "the benefit plan does not give Sun Life any authority to determine eligibility for benefits or to construe the terms of the plan." (Joint Pret. Doc., p. 9). Arguing that All–Lock, as Plan Administrator, has the sole authority to eligibility determinations, plaintiff asserts that the Plan does not give defendant authority to interpret the terms and conditions of the Plan. Without authority to interpret the Plan, defendant has no discretion in the matter and the *de novo* standard applies, according to plaintiff.

Although defendant also relies on *Firestone Tire & Rubber,* it has a markedly different reading of the Plan. According to defendant, the Plan vests it with discretion to make benefit determinations by requiring "satisfactory" proof of claims. Therefore, because the Plan affords defendant discretion to review AD & D claims under the Plan, defendant asserts that its fact-based determinations and Plan interpretations cannot be disturbed if reasonable based on the information known to it at the time the decision was rendered.

■ Based a review of the Policy, the Policy Summary, the Administrator's Guide, and other relevant material in the record, the court concludes that the Plan does contemplate the exercise of discretion by defendant and, therefore, that defendant's decisions are subject to the arbitrary and capricious standard.[12]

---

12. In addition to the *de novo* standard of review urged by plaintiff and the arbitrary and capricious standard of review urged by defendant, the Court of Appeals for the Eleventh Circuit has identified, based on its reading of *Firestone Tire & Rubber,* a third standard of review which, in this court's view, is the standard which should be employed in this case. This third standard is to be used in cases "where an insurance company serves as the decision making fiduciary for benefits that are paid out of the insurance company's assets." *Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1561 (11th

Cir.1990). Later describing this third standard of review as the "heightened arbitrary and capricious standard where there is a conflict of interest," (*Marecek v. BellSouth Telecommunications, Inc.,* 49 F.3d 702, 705 (11th Cir.1995); *see also Buckley v. Metropolitan Life,* 115 F.3d 936, 939 (11th Cir.1997)), the court of appeals held:

> [W]hen a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan pro-

Admittedly, none of the documents, including the Policy and Policy Summary, expressly state that defendant has the authority to review claims. Yet, it is clear that such a review is provided for by the Policy and Policy Summary.

As set forth in the Administrator's Guide, the Plan Administrator (here, All–Lock) is tasked with making the initial determination that a person is entitled to benefits under the Policy. *See, e.g.,* Administrator's Guide, p. C/ST–2 and p. C/ST–2 ("Once you have determined that an employee is eligible for benefits, the initial claim form packet should be completed and returned to Sun Life as soon as possible."). Once the Plan Administrator makes the initial eligibility determination, defendant is plainly tasked with making a final eligibility determination. *See, e.g.,* Administrator's Guide, p. C/ST–4 ("By receiving the initial claim forms early, we [Sun Life] can thoroughly investigate the claim for disability during the elimination period and make a determination prior to

the due date of the first disability payment."); *Id.* ("Once the completed claim forms have been received at Sun Life of Canada, the claim will be carefully reviewed by one of our claims examiners."); *Id.* at p. C/ST–6 ("If there is no apparent medical reason for disability outside of normal guidelines, a claims investigation will be initiated to determine if the additional benefits are compensatory in accordance with the contract."); *Id.* at p. C/ST–10 ("Sun Life will conduct a complete investigation to determined if the disability is work-related.").

Additionally, with respect to all claims, defendant "may require as part of the Proof [of Claim], authorization to obtain medical and non-medical information." (The Policy, p. 50). More specifically, with respect to a death benefits claim, defendant has the right "to request an autopsy where not prohibited by law." (The Policy, p. 47).

---

visions committed to its discretion was not tainted by self-interest. That is, a wrong but apparently reasonable interpretation (ftn.12) is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries.

    FN12. It is fundamental that the fiduciary's interpretation first must be "wrong" from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary.

*Brown,* 898 F.2d at 1566–67 (citations omitted).

This court will not apply the third standard of review to this case for three reasons. First, neither party, including plaintiff, has even mentioned the heightened arbitrary and capricious standard, much less requested the court to employ it. Second, because neither side asked that this standard be utilized, neither side has offered evidence to support their respective burdens of proof under the heightened arbitrary and capricious standard. Based on the court's perusal of the record, it appears that All–Lock paid premiums to defendant at fixed monthly rates for the first 24 months the Policy was in effect, after which the rates became adjustable. (There is noth-

ing in the file which indicates if All–Lock's premiums increased following the initial 24–month period and, if so, by how much and on what grounds the increase was based). It also appears that benefits are paid by defendant out of its own assets without reimbursement from All–Lock (except, possibly, indirect reimbursement through increased premiums). If these appearances are accurate, then All–Lock and defendant would have conflicts of interest which would need to be considered in a review of their actions regarding plaintiff's claim for benefits. *Compare Brown,* 898 F.2d at 1159–1568 (applying heightened arbitrary and capricious standard in situation where defendant insurance company/fiduciary paid benefits out of its own assets) *with Buckley,* 115 F.3d at 939–40 (applying "non-heightened" arbitrary and capricious standard in situation where "benefits are paid from a trust funded through periodic, nonreversionary contributions by [the employer]," not by the defendant insurance company/fiduciary). However, without input and proof from the parties, the court will not attempt to do what the parties should have done. Third, as set forth in the text, the denial of benefits must be upheld in this case even under the *de novo* standard of review, a more stringent standard than the heightened arbitrary and capricious standard.

Finally, and most importantly, the Policy and the Policy Summary clearly provide that the Proof of Claim must be "satisfactory" to defendant before benefits will be paid. (The Policy, p. 50—"When Sun Life receives satisfactory Proof of Claim, benefits payable under this Policy will be paid for any period for which Sun Life is Liable." *Accord,* The Policy Summary, p. 38). The Policy also provides that "Proof must be satisfactory to Sun Life." (The Policy, p. 50. *Accord,* The Policy Summary, p. 38). The use of the term "satisfactory" contemplates a review of the submitted evidence for evaluation by defendant, and clearly, such a review and evaluation requires the exercise of discretion. Thus, the only reasonable interpretation of these two Policy and Policy Summary provisions is that defendant is granted discretion to review and evaluate a submitted claim to ascertain whether benefits under the Policy are due to be paid. The court also notes that no such language is employed in any of the documents as to All–Lock, the Plan Administrator, or to any other entity.

Other courts have construed the use of the term "satisfactory" in other ERISA plans as a grant of discretion to the entity to whom the evidence must be submitted. For example, in *Bali v. Blue Cross and Blue Shield Association,* 873 F.2d 1043, (7th Cir.1989), the Court of Appeals for the Seventh Circuit concluded that the following language constituted a grant of discretion with respect to what evidence "may be required from an applicant to provide a basis for the subsequent disability determination":

> "Disabled" means that a Participant is, *determined on the basis of medical evidence satisfactory to the Committee,* wholly prevented, by reason of mental or physical disability, from engaging in any occupation comparable to that in which he was engaged for the Employer, at the time his disability occurred.

*Bali,* 873 F.2d at 1047 (emphasis added).

Three district courts, interpreting other Sun Life policies containing very similar (if not identical) "proof must be satisfactory to us" language, have held (albeit with little discussion) that the Plans granted Sun Life discretion to review claims. *See Harrison v. Sun Life Assurance Co. of Canada,* No. 98–C–2994, 1999 WL 528519, at *1 (N.D.Ill. July 19, 1999) ("In this case, the policy broadly states that a claimant's proof of disability must be satisfactory to Sun Life, and we thus apply the [arbitrary and capricious] standard [which applies to ERISA decision-makers who exercise discretion].");  *Marchetti v. Sun Life Assurance Co. of Canada,* 30 F.Supp.2d 1001, 1007 (M.D.Tenn.1998); *Nelson v. Sun Life Assurance Co. of Canada,* 962 F.Supp. 1010, 1012 (W.D.Mich.1997) ("Where proof of eligibility for benefits must be 'satisfactory' to the company, courts have characterized the company's authority as discretionary within the meaning of [Firestone Tire & Rubber].") (citations omitted).

The Court of Appeals for the Sixth Circuit, sitting *en banc,* has gone further and held that plan language which requires the proof or evidence to be satisfactory—without specifically identifying to whom the proof or evidence must be satisfactory— "naturally" means that the proof or evidence must be satisfactory to the entity to whom the claims are submitted:

> Although many of our prior cases finding a clear grant of discretion involved ERISA plans which explicitly provided that the evidence be satisfactory "to the insurer," "to the company," or "to us," it does not automatically follow that in the absence of such language discretion has not been granted to the plan administrator. Both parties acknowledge that the Plan allows for Aetna to request and receive satisfactory evidence of total disability before an individual is entitled to receive continued benefits. We agree with Aetna that this "right to require as part of the proof of claim satisfactory evidence" means, semantically, that the evidence must be satisfactory to Aetna, the only named party with the right to request such evidence. It naturally follows that Aet-

na, the receiver of the evidence, would review the evidence to determine if it constitutes satisfactory proof of total disability. It is simply implausible to think that Aetna would merely hold the evidence as a safekeeper or depository for a third party unnamed in the contact to review in making benefits determinations. This is all the more true when one considers that an insurance contract, even one governed by ERISA, is after all simply a contract—a mutual agreement between the two contracting parties.

In short, reading the contractual language in an ordinary and popular sense as we must, the only reasonable interpretation of the Plan is that Aetna requests the evidence, reviews it, and then makes a benefits determination. To reach any other conclusion would violate the basic principle of contract law that courts are not permitted to rewrite contracts by adding additional terms.... We therefore conclude that the plan clearly grants discretion to Aetna because, under the only reasonable interpretation of the language, Aetna retains the authority to determine whether the submitted proof of disability is satisfactory.

*Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556–57 (6th Cir.1998) (*en banc*) (citations and footnote omitted). *Accord, Fitts v. Fed. Nat. Mort. Ass'n.*, 77 F.Supp.2d 9, 18–19 (D.D.C.1999) ("[W]hen no one other than Unum is mentioned in the relevant policy provision, who else but Unum would have to be satisfied with claimant's proof of a covered disability? ... [I]t is difficult to see how Unum could decide whether or not to grant a claim for disability benefits without assessing the adequacy of the required proof that the claimant suffers from a covered disability. That assessment clearly partakes of discretion.").

Based on the fact that the Policy authorizes defendant to gather additional information before paying benefits and that the proof of claim must be satisfactory to defendant (as opposed to All–Lock), the court concludes that defendant is a fiduciary under the Policy, that it has the authority to investigate and review claims submitted to it through the Plan Administrator, and that defendant must, therefore, exercise discretion in its investigation and review—thus rendering its denial decisions subject to the arbitrary and capricious standard.[13]

## IV. Appeal of the Denial

There is one other issue the court must address before it turns to the question of whether defendant's denial of plaintiff's AD & D benefits claim was arbitrary and capricious. That issue is whether defendant was the proper entity to hear plaintiff's appeal of the benefits claim denial.

After defendant denied plaintiff's claim for AD & D benefits, plaintiff sought to appeal that decision. Based on a document plaintiff received from defendant titled "ERISA Rights", plaintiff took the position that the Plan Administrator was the entity who was handled the appeals. Defendant maintained, however, that appeals were resolved by it, and, after considering plaintiff's additional arguments with respect to defendant's original denial decision, affirmed that original denial of AD & D benefits.

In this litigation, plaintiff continues to argue that defendant had no authority to hear an appeal of its denial of the AD & D benefits.

Title 29, Code of Federal Regulations, § 2560.503–1(g)(1) provides *inter alia:*

Every plan shall establish and maintain a procedure by which a claimant or his duly authorized representative has a reasonable opportunity to appeal a denied claim to an appropriate named fiduciary or to a person designate by such fiduciary, and under which a full and fair review of the claim and its denial may be obtained.

**13.** *See* footnote 12.

Thus, by law, each ERISA plan must establish and maintain an appeal procedure. In this case, the Plan itself does not contain such an appeal procedure. Although prudence dictates that the better practice would be to set forth the appeal procedure in the Policy, the law does not appear to require inclusion of the appeal procedure in the Plan or Policy.[14]

Plaintiff asserts that an appeal must be heard by the Plan Administrator (here, All–Lock) and that defendant has no "appellate" authority. In support of its position, plaintiff points generally to the one-page generic "ERISA Rights" document provided by defendant, (*see* Jancura depo., exh. I, p. 4), but she does not cite any particular language in that document to support her position. In the court's view, the only relevant language is the following paragraph:

> If your claim for a welfare benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have the plan review and reconsider your claim.

*Id.* This quoted paragraph is ambiguous. One plausible interpretation is that the author[15] used the term "the plan" generally to encompass all types of ERISA plans (*i.e.,* those plans which give review authority to the Plan Administrator as well as plans which give review authority to plan fiduciaries) and did not use the term to describe which entity has review authority with respect to plaintiff's particular plan.

A second plausible interpretation is that the paragraph contains a typographical error, in that the word "plan" was intended to be used as a modifier of the word "Administrator" or "fiduciary." This interpretation would be consistent with the rest of the "ERISA Rights" document.[16] If this interpretation is correct, then the omitted word is most likely "fiduciary" because the word "plan" is capitalized every time it is used to modify the word "Administrator," and it is never capitalized when it is used to modify the word "fiduciary." Thus, if the "ERISA Rights" document is interpreted to provide that the plan fiduciary is authorized to review a denial of benefits, then defendant would be authorized to conduct such a review as it is a fiduciary under the Plan.[17]

The court need not decide which interpretation is correct, however, for it concludes that this document is not a part of the Plan in this case and therefore does not establish an appeal procedure under the Plan at issue. The court premises this conclusion on the fact that there has been no showing as to who prepared the document, no showing that the employer and defendant intended the document to be a part of their plan, and no showing that the document was intended by the parties to describe the plan at issue in this case. Thus, the court must look elsewhere to determine which entity had review authority under this ERISA plan.

14. It is not disputed that plaintiff was aware of her right to appeal the denial of AD & D benefits decision, and it is not disputed that plaintiff timely exercised her appeal rights. *See* Franklin Jancura depo., exh. F.

15. The parties do not state the origin of this document, and the document itself is silent on the subject.

16. Whenever the word "plan" is used as a noun in elsewhere in the document, it is used to refer to the group insurance plan. It is not used to refer to a person with responsibilities under the group insurance plan. *See, e.g.,* "If you have any questions about your plan, you should contact the Plan Administrator."

17. Generally speaking, a person is a "fiduciary" with respect to an ERISA plan to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment management advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or had any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
29 U.S.C. § 1002(21).

■ Citing 29 C.F.R. § 2560.503–1(g)(2), defendant asserts that it has the authority to resolve all appeals of its denial of benefits decisions. That Code section provides:

> To the extent that benefits under an employee benefit plan are provided or administered by an insurance company . . ., the claims procedure pertaining to such benefits may provide for review of and decision upon denied claims by such company. . . . In such case, that company . . . shall be the "appropriate named fiduciary" for purposes of this section [which requires the establishment and maintenance of an appeal procedure]. In all other cases, the "appropriate named fiduciary" for purposes of this section may be the plan administrator or any other person designated by the plan, *provided that* such plan administrator or other person is either named in the plan instrument or is identified pursuant to a procedure set forth in the plan as the person who reviews and makes decisions on claim denials.

29 C.F.R. § 2560.503–1(g)(2) (emphasis added). Because the Policy does not contain an appeal procedure and because the Plan Administrator is not designated in the Policy (or elsewhere) "as the person who reviews and makes decisions on claims denials," *id.*, the court concludes that the defendant insurance company, by such default, is authorized under the first sentence of § 2560.503–1(g)(2) to review denials of benefit claims. Accordingly, because defendant is deemed to be a fiduciary under § 2560.503–1(g)(1) & (2) when it reviews denied claims, the arbitrary and capricious standard applies to its review of the denied claim (as well as to its original denial).[18]

## V. Review of the Denial and the Affirmance of the Denial

■ Notwithstanding the foregoing conclusion that the appropriate standard of review is the arbitrary and capricious standard, the court has taken a *de novo* review of plaintiff's claim and concludes that, even under the most stringent standard of review, denial of the claim and the affirmance of the denial were correct.[19]

Defendant denied plaintiff's AD & D benefits claim on two grounds: first, that "[t]he injuries resulting from Mr. Sorrells' death were reasonably foreseeable and were the natural and probable result of

---

**18.** The conclusion that defendant is authorized to handle appeals of the benefit claims denials is further buttressed by the Administrator's Guide, which contains the following "Right to Appeal" provision in the Long–Term Disability section:

> If you or the employee disagree with the claim denial, a written appeal should be sent to Sun Life within 60 days from the original notice of denial. The appeal should specifically outline the points of disagreement and include additional medical information or other documentation in support of these concerns, Upon receipt of this information *we will conduct a complete and independent review of the claim. You and the employee will be notified in writing once the review had been completed and a final claims determination had been made.*

Admin. Guide, p. C/LT–4 (emphasis added). On its face, this appeals provision applies only to denials of long-term disability claims and is thus not applicable to denials of accidental death claims such as the one at issue here. (No obvious reason appears for not having an appeals provision applicable to the denial of any claim under the plan). Nevertheless, the court mentions this provision for two reasons: it (especially the italicized portions) confirms the court's previous conclusion that defendant is the entity vested with the authority to hear and decide the claim in the first instance, and it indicates the contracting parties' (All–Lock and defendant Sun Life) intent that defendant hear and decide appeals of denied claims.

**19.** As the Eleventh Circuit decided two years ago, "[W]here the plan affords the administrator discretion, the administrator's fact-based determinations will not be disturbed if reasonable based on the information known to the administrator at the time the decision was rendered." *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir.1997). However, under a *de novo* review, the court may consider all information presented to it at the time of its ruling. *See Moon v. American Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir.1989) ("American Home's contention that a court conducting a *de novo* review must examine only such facts as were available to the plan administrator at the time of the benefits denial is contrary to the concept of a *de novo* review.").

conduct knowingly undertaken and therefore, were not due to accidental means," and, second, that [t]he operation of an automobile while under the influence of alcohol beyond the legal limit is considered an illegal act in the state of Alabama, and therefore falls within the policy exclusion applicable to "committing to attempting to commit an assault felony, or other illegal act." Both of these grounds are primarily predicated on the undisputed fact that Mr. Sorrells was operating his vehicle with a blood alcohol content (BAC) of nearly three times the legal limit in Alabama.[20]

Plaintiff asserts that defendant failed to take into account or give adequate weight to the investigating trooper's finding that Mr. Sorrells was under "no defect" at the time of the accident. Plaintiff has also tendered an affidavit of an off-duty county sheriff (who heard Mr. Sorrells' accident and responded) in which he states that he "did not smell any alcohol on [Mr. Sorrells] breath" and did not "observe anything that in any way indicated that Mr. Sorrells was intoxicated." (Pugh aff. ¶ 8). The court concludes that greater weight should be given to the toxicology report than the "no driver defect" items in the accident report upon which plaintiff relies. The court also concludes that the Pugh affidavit does not justify a different conclusion.[21]

Plaintiff's argument that the investigating trooper listed "No Defect" in the "Driver Condition" box on the accident form is unpersuasive. As an initial matter, plaintiff's argument is defeated by the fact that the trooper listed "Driving Under the Influence" as a "Other Contributing Factor" in the accident. Moreover, the "Driver Condition" box lists the following six options for the trooper to consider: "No Defect"; "Apparently Asleep"; "Fatigued"; "Ill"; "Other"; and "Unknown." It is not clear whether "Driving Under the Influence" would constitute a "Driver Condition." Even if "Driving Under the Influence" is considered to fall within the term "Driver Condition," the marking of the "Other" option under "Driver Condition" (which would be the only "Driver Condition" option that would encompass "Driving Under the Influence") would be redundant in light of the fact that the trooper indicated on the two-page form that "Driving Under the Influence" was a contributing factor and that (in the trooper's opinion) the driver was not sober.

To the extent that plaintiff asserts that Mr. Sorrells' intoxication was not a cause of the accident, the court notes that there is no evidence in the record to suggest that there was any other cause of the accident.[22] The road was dry and unobstruct-

20. In one of her documents, plaintiff asserts that defendant has not established a chain of custody of Mr. Sorrells' blood from the time it was drawn from his body until the time it was tested. From this failure-to-establish-chain-of-custody argument, plaintiff suggests that defendant should not have relied on the toxicology report when making its decision. This assertion misses the mark. Defendant, who played no role in the decision to administer the test or the actual test administration, or the analysis of the test results, was entitled to rely on the official state department test in the absence of any evidence that the results are inaccurate or somehow comprised, and the court finds nothing arbitrary and capricious on such reliance. Additionally, as plaintiff has presented no evidence that the test results are inaccurate, the court will also rely on the toxicology report.

21. Plaintiff did not tender the Pugh affidavit until after this litigation was filed. If the

issue to be decided is whether defendant acted arbitrarily and capriciously when it made its decision as to the AD & D claim, the motion to strike the Pugh affidavit is due to be granted, as the issue is to be decided based on the information defendant had before it when it made its decision as to the AD & D claim. However, because the court is conducting a de novo review of defendant's decision of benefits, the court will consider the Pugh affidavit. Accordingly, **it is ORDERED that the motion to strike the Pugh affidavit is DENIED.**

22. The accident report indicates that Mr. Sorrells was driving 60 mph in a 45 mph zone. To the extent that plaintiff asserts that speeding was a cause of the accident, Mr. Sorrells' ability to judge the safety (and legality) of his rate of speed was, without question, impaired by his intoxication.

ed, and no other vehicles were involved. Moreover, there were no witnesses, and, thus, there is no one who can attest to Mr. Sorrells' driving ability immediately prior to the accident. Finally, Mr. Sorrells' level of intoxication was significant. Given the well-documented and well-known effects of intoxication on a person's ability to operate a motor vehicle, and given the absence of evidence of any other cause of the accident, the court concludes that there is no conflicting evidence which would require a trial on the issue.[23,24]

As for Deputy Pugh's affidavit, the court finds that Deputy Pugh's subjective observations of Mr. Sorrells immediately after the accident simply cannot overcome the objective results of the toxicology report. Mr. Sorrells was undeniably intoxicated at the time of the accident whether or not Deputy Pugh was not able to detect it. Thus, the court concludes that there is no conflicting evidence which would require a trial on the issue.

The vast majority of other courts to consider the issue have upheld the denial of benefits under policies using similar, if not identical, terms and exclusions when the claims are based on injuries or death due to motor vehicle accidents caused by drunk driving. For example, in *Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104 (7th Cir.1998), a claim for AD & D benefits was denied by the fiduciary under an ERISA plan. There,

Mr. Cozzie was killed in a car accident. According to investigators, Mr. Cozzie's vehicle was found overturned in a field, where it had come to a rest, after missing a curve in the road, striking an embankment and rolling over three times. Mr. Cozzie had a blood alcohol level of .252%. This amount is more than 2+ times the legal limit under Illinois law at the time of the accident.... There were no witnesses to the accident and no apparent cause other than Mr. Cozzie's impaired condition.

*Id.* at 1106. As Sun Life did in this case, the claims fiduciary in *Cozzie* defined the term "accident" (which was not defined in the policy) in terms of "reasonable foreseeability" and concluded that it was reasonably foreseeable that Mr. Cozzie "would suffer a fatal injury if he got behind the wheel of an automobile in such a state of inebriation." *Id.* at 1108. The court of appeals upheld that conclusion, noting, "[G]iven the amount of alcohol ingested here and the exclusion of any other cause for the accident, we cannot say that it was arbitrary and capricious for MetLife to determine that this particular vehicular death was no accident." *Id.* at 1111.

One year ago, the Court of Appeals for the Fourth Circuit upheld the fiduciary's denial of ERISA benefits based on the conclusion that injuries sustained while driving under the influence fell within the policy's exclusion of benefits for treatment

23. In her appeal of the benefits denial, plaintiff argues that driving under the influence is not an "illegal act" as that term is used in the Policy. After due consideration, the court concludes that that argument is without merit.

24. In *Sisters of the Third Order of St. Francis v. SwedishAmerican Group Health Benefit Trust*, 901 F.2d 1369 (7th Cir.1990), a case relied upon by Ms. Sorrells, the plaintiff sought reimbursement of the medical expenses it incurred while saving the life of a plan participant following a motor vehicle accident caused by the participant's drunk driving:

The Medical Center demands a trial on the question whether besotted driving caused the crackup.... [However,] the

Medical Center did not offer any evidence suggesting a genesis unrelated to John Wright's [the plan participant's] imbibing. If evidence suggested that a mechanical defect in the car led it off the road, or that Wright swerved to avoid an oncoming vehicle, a trial would be essential. The record contains no such evidence. The Medical Center's only theory is that loose gravel on the shoulder prevented Wright from getting his car back on the road. This is not only unsupported but also irrelevant, because it does not meet the inference that Wright's inebriation led him to drive on the shoulder, where gravel and worse hazards await.

*Id.* at 1371. As noted in the text, Ms. Sorrells has offered no "evidence suggesting a genesis unrelated [to Mr. Sorrells'] imbibing," and, thus, there is no need for a trial.

of injuries "due to voluntary participation in a felony." *Baker v. Provident Life & Acc. Ins. Co.,* 171 F.3d 939, 941 (4th Cir. 1999). Mr. Baker pled guilty to involuntary manslaughter after killing another driver in an automobile accident caused by Baker's intoxication. As the appellate court noted, "[s]hortly after the accident, Baker's blood alcohol content registered .286—over three times the legal limit in North Carolina." *Id.* at 941. Citing *Cozzie,* the court rejected Baker's argument that he did not voluntarily kill the other driver:

> We hold that this same rule [the *Cozzie's* court conclusion that "a death that occurs as a result of driving while intoxicated, although perhaps unintentional, is not an 'accident' because that result is reasonably foreseeable"] applies to the exclusion in Baker's policy for voluntary participation in a felony. Baker voluntarily drank too much. He voluntarily got behind the wheel of his automobile while drunk. And he voluntarily crossed the center line into oncoming traffic. No one force Baker to drink too much, to drive while drunk, or to crash headlong into [the other driver]. The dangers of driving while intoxicated are plain. Baker cannot now be heard to claim that he was unaware that his behavior threatened his own life and those of other motorists. Inasmuch as a reasonable person in Baker's position would have known that death or serious injury was a reasonably foreseeable result of driving while intoxicated, Baker's participation in the felony of involuntary manslaughter was voluntary.

*Id.* at 942–43. *Accord, Smith v. Life Ins. Co. of N. America,* 872 F.Supp. 482, 484–85 (W.D.Tenn.1994) ("[I]t is clear that decedent's voluntary consumption of alcohol resulting in his blood alcohol level of .23, was at least a partial cause of the collision. Thus, the collision did not occur solely by accidental means as required by the policy."); *Cates v. Metropolitan Life Ins. Co.,* 14 F.Supp.2d 1024 (E.D.Tenn.1996) ("It is neither unreasonable nor irrational in light of the Plan's provisions for Metropolitan to conclude 'the act of driving while [intoxicated at BAC 00.18] rendered the infliction of serous [sic.] injury or death reasonably foreseeable and hence, not accidental as contemplated by the [P]lan.' ") (brackets in original); *Fowler v. Metropolitan Life Ins. Co.,* 938 F.Supp. 476, 480 (W.D.Tenn.1996) ( "[T]he hazards of drinking and driving are widely known and widely publicized. It is clearly foreseeable that driving while intoxicated may result in death or bodily harm. As the decedent should have foreseen the consequences of driving while intoxicated, Met Life's determination that his death was not accidental was reasonable."); *Schultz v. Metropolitan Life Ins. Co.,* 994 F.Supp. 1419, 1422 (M.D.Fla.1997) ("The horrors associated with drinking and driving are highly publicized and well known to the public.... Mr. Rector knew, or should have known, that he was risking his life in a real and measurable way by driving while intoxicated. Any other expectation would have been unreasonable. Consequently, Defendant did not act arbitrarily and capriciously in denying Benefits under the Plan to Plaintiff."). *Contra, Buce v. Nat. Serv. Ind., Inc.,* 74 F.Supp.2d 1272 (N.D.Ga.1999) (Although the court acknowledged that "[a] reasonable person would have foreseen that driving with a blood alcohol level of .22 grams percent was highly likely to result in injury or death," *id.* at 1276, the court nevertheless held that "[d]eath as a result of a car wreck is the quintessential accident under general understanding of that term," and therefore, concluded that "[i]t is arbitrary and capricious for an insurer to deny a claim based upon an interpretation of 'accident' that is not stated in the policy and that is contrary to the expectations of the ordinary insured." *Id.* at 1279).

Accordingly, the court concludes that (1) defendant did not act in an arbitrary and capricious manner in reaching its conclusions that Mr. Sorrells' injuries were foreseeable under the circumstances and that he was committing an illegal act at the time he sustained his injuries and (2) that, even under a *de novo* review of the facts and the terms and provisions of the Policy

and the Policy Summary, Mr. Sorrells' operation of a motor vehicle while voluntarily intoxicated (as defined under Alabama law) was a contributing (if not sole) cause of the accident and (a) was thus not an "accident" as defined in the Policy and (b) was an illegal act under Alabama law, both of which justify a denial of plaintiff's claim for AD & D benefits in this case.

## CONCLUSION

Defendant is entitled to judgment as a matter of law as to all of plaintiff's claims. In accordance with Federal Rule of Civil Procedure 58, judgment will be entered by separate document.