POLLAK, District Judge:
This appeal presents questions arising from the denial — initially by the plan administrator and then by the insurance carrier — of death benefits claimed under an employer-sponsored personal injury insurance policy governed by the Employee Retirement Income Security Act (“ERISA”), 29 U.S.C. §§ 1001 et seq. On “heightened arbitrary and capricious” review by the District Court, the denial of benefits was overturned and the plaintiff — the widow of the decedent — was awarded $150,000, the face amount of the policy. On appeal to this court, the insurance carrier contends that the District Court erred, under ERISA, (1) in its rejection of the carrier’s interpretation of the policy teim “bodily injury caused by an accident ... and resulting directly and independently of all other causes in loss covered by the policy” as applied to the facts of the decedent’s death, and (2) in its rejection of the carrier’s reliance on the policy's intoxication exclusion provision as an alternative ground for denial of the claimed benefits. The insurance carrier also argues that the proper standard of District Court review of the denial of benefits was not “heightened arbitrary and capricious” but “arbitrary and capricious.”
in Part I of this opinion we outline the principal facts giving rise to the plaintiffs claim and the manner in which the claim was addressed by, first, the plan administrator and, second, the insurance carrier. In Part II, we summarize the history of the case after it came to court — first, a Georgia state court and then, on removal, the District Court. In Part III we consider the contentions made by the insurance carrier on appeal.
I
Walter H. Buce, Jr., a Georgia resident, was employed by National Services Industries, Inc. (“NSI”), a company located in Atlanta. In 1985 Mr. Buce elected to become insured under a group Personal Accident Insurance Plan provided by NSI as an optional employee benefit. The accident insurance plan — originally underwritten by Fireman’s Fund, Inc., but taken over, in 1993, by Allianz Life Insurance Company of North America (“Allianz”)— provided that: “The Plan is to be interpreted in accordance with the laws of the State of Georgia.” On December 13, 1995, at about 2:00 a.m., Mr. Buce, was killed in a single-vehicle crash on Interstate 75 near Cleveland, Tennessee. There were no passengers or other witnesses. A posthumously drawn blood sample measured Mr. Buce’s alcohol level as .22 percent.
Mr. Buce’s widow, Patricia W. Buce, the beneficiary of her husband’s accident policy, filed a claim. NSI, Mr. Buce’s employer, referred the claim to Allianz, the insurance carrier. Allianz in turn referred the claim to American Special Risk Management (“ASRM”), the company retained by Allianz to act as administrator of the insurance plan; as of that time, Allianz was ASRM’s sole client.
*1137 On March 12, 1996, ASRM, in a letter written by its Claims Director, Edward F. Carroll, denied Mrs. Buce’s claim. The substance of Mr. Carroll’s decision was as follows:
This Policy provides a “Loss of Life Accident Indemnity. When injury results in the loss of life of the Insured Person”. The Policy also states the following:
20. The Company shall not be liable for any loss sustained in consequence of the person whose injury is the basis of a claim being intoxicated or under the influence of any narcotic unless administered on the advise [sic ] of a physician.
We have obtained the Cleveland Police Department report that indicated this single car accident happened when the car “left the roadway on the right hand shoulder of the road striking the guard rail”. The Tennessee Bureau of Investigation’s Forensic Services Crime Laboratory report on Alcohol, indicated the insured’s level was twice the legal limit permitted to operate a vehicle. We therefore, must deny any Accidental Death Benefits for this accident, under the terms of this policy.
Mrs. Buce’s attorney, John E. Robinson, took issue with Mr. Carroll’s decision in a letter dated May 9, 1997. Mr. Robinson’s letter was referred to Douglas Campbell, Allianz’s attorney. On July 11, 1997 Mr. Campbell wrote to Mr. Robinson reaffirming the denial of Mrs. Buce’s claim:
This Firm represents Allianz Life Insurance Company of North America [the “Company”] and your letter of May 9, 1997, regarding the above referenced claim has been referred to us for response ....
[T]he Company has, at your request, re-evaluated this claim and the materials you have submitted in support thereof. This is an accident policy which, as applicable to this particular claim, provides payment of benefits where loss of life is due to bodily injury caused by an accident and resulting directly and independently of all other causes in death. As such, it is an “accidental means” policy which requires that, in the act which preceded the injury, there must have occurred something sudden, unexpected and unforeseen. In the first instance, the materials you have submitted do not show any positive identification of the individual found in the wrecked automobile as in fact being Mr. Buce, even though the death certificate states that it was. Moreover, even if the body was that of Mr. Buce, tests revealed that, several hours after the wreck, there was present a blood alcohol level of .22%, which would mean that Mr. Buce was intoxicated at the time of the wreck. Given the weather and road conditions as reported by the authorities, and the lack of any evidence of vehicular malfunction, it appears that Mr. Buce’s injuries were occasioned by his voluntary ingestion of alcohol and were therefore not “bodily injuries causefd] by an accident” as required by the coverage provisions of the Policy.
Furthermore, the Policy contains the following exclusion:
20. The Company shall not be liable for any loss sustained in consequence of the person whose injury is the basis of claim being intoxicated ...
As the Policy contains no definition of intoxication, the common law definition would apply — namely, that the person was materially impaired fi*om guarding himself against casualty or injury. A person with a .22% (or higher at the time of the wreck) blood alcohol level is *1138 undoubtedly materially impaired within the meaning of that definition. As discussed in the preceding paragraph, it was this impairment which caused the wreck that resulted in Mr. Buce’s death.
For the foregoing reasons, and based entirely on the information available to us at this time, including the information you submitted in support of the claim, the Company, upon reconsideration, again denies the claim.
On December 5, 1997, in response to a further letter from Mr. Robinson, Debra Libby, NSI’s Assistant Counsel, stated that “we regret that this unfortunate event occurred, but the claim does not appear to be covered by the Plan.”
II
Six days later — on December 11, 1997— Mrs. Buce filed this law suit, naming as defendants NSI, ASRM and Allianz (the latter was originally sued under its former name, North American Life and Casualty Company). Suit was brought in the Superior Court of Fulton County, Georgia. Invoking ERISA, the defendants removed the case to the United States District Court for the Northern District of Georgia.
After granting in part and denying in part motions for summary judgment filed by the defendants, the District Court conducted a two-day bench trial. Shortly thereafter, the District Court filed its opinion awarding judgment in Mrs. Buce’s favor, against Allianz, for the policy proceeds of $150,000, plus prejudgment and post-judgment interest. “The denial of benefits was arbitrary and capricious,” the District Court ruled, “and the Plaintiff is entitled to the death benefit due under the Plan.” Buce v. National Service Industries, Inc., et al., 74 F.Supp.2d 1272, 1280 (N.D.Ga.1999). Finding no “breach of fiduciary duty,” id., on the part of ASRM and NSI, the District Court directed the entry of judgment in favor of those defendants.
In ruling against Allianz, the District Court came to a series of conclusions:
(A) The first issue addressed by the District Court was the standard of review under which it was to judge the correctness of Allianz’s denial of benefits. The District Court noted that the Supreme Court, in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), had held that “a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan .... Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a ‘factofr] in determining whether there is an abuse of discretion.’ ” In the case at bar, the District Court found that de novo review was not an option, since the policy’s Summary Plan Description provided that “[t]he insurance company has the exclusive right to interpret the provisions of the Plan, so its decision is conclusive and binding.” 74 F.Supp.2d at 1275. The District Court pointed out, however, that, in conformity with Firestone ’s admonition about conflicts of interest, the very deferential “arbitrary and capricious” standard requires modification where the insurance carrier is the effective decision-maker. As the District Court observed, this court has had several occasions to address this problem, most notably in Brown v. Blue Cross and Blue Shield of Alabama, Inc., 898 F.2d 1556, cert. denied, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991), and Buckley v. Metropolitan Life, 115 F.3d 936 (11th Cir.1997). In Buckley, so the District Court *1139 noted, we said that the less deferential “heightened arbitrary and capricious standard must be used when the plan was administered by an insurance company which paid benefits out of its own assets.” 115 F.3d at 939. Applying these teachings to the role of Allianz in relation to Mrs. Buce’s claim, the District Court concluded that the case before it was controlled by Brown v. Blue Cross and Blue Shield of Alabama, Inc. “There, Blue Cross determined whether it would pay benefits from its own coffers — an inherent and obvious conflict of interest. The situation here differs only slightly with ASRM evaluating Plaintiffs claim for its only client and then a final decision by Allianz. Therefore, the Court may review the determination of benefits under the heightened arbitrary and capricious standard.” 74 F.Supp.2d at 1276. The impact of this ruling was, according to the District Court, that: “First, the Court must determine whether under a de novo review Plaintiff has offered a sufficiently sound interpretation of the disputed plan provision to rival the Defendants’ contrary determination .... Second, the Court must determine whether the fiduciary’s adoption of the different interpretation was ‘arbitrary and capricious.’ ” Id.
(B) Mr. Buce’s policy provided coverage for “bodily injury caused by an accident ... and resulting directly and independently of all other causes in loss covered by the policy.” In the July 11, 1997 letter of Allianz’s attorney, reaffirming the denial of Mrs. Buce’s claim, the carrier’s position was that “[t]his is an accident policy which, as applicable to this particular claim, provides payment of benefits where loss of life is due to bodily injury caused by an accident and resulting directly and independently of all other causes in death. As such, it is an ‘accidental means’ policy which requires that, in the act which preceded the injury, there must have occurred something sudden, unexpected and unforeseen .... [I]t appears that Mr. Buce’s injuries were occasioned by his voluntary ingestion of alcohol and were therefore not ‘bodily injuries cause[d] by an accident’ as required by the coverage provisions of the Policy.” The District Court discussed the legal sufficiency of the carrier’s position as follows:
The first question to be addressed is whether the insurance company properly interpreted the Plan by reading into the policy an exclusion for injury or death that is foreseeable based upon such risk increasing behavior as driving while intoxicated. In Laney v. Continental Ins. Co., 757 F.2d 1190 (11th Cir.1985), the Eleventh Circuit addressed this issue in the context of a diversity case applying Georgia law. The decedent in that case died of acute alcohol poisoning; the autopsy showed a blood alcohol content of .47 grams percent. The court recognized that Georgia law distinguishes between the terms “accidental injury” and “injuries resulting from accidental means.” Id. at 1191. Applying Georgia law, the court concluded that “caused by accident” is synonymous with “accidental means.” Id. at 1192. “The focus is on the occurrence or happening which produces the result, not the result itself.” Id. The court then concluded:
Given this construction of the policy term, it is evident that the defendant was entitled to judgment as a matter of law. Mrs. Laney does not dispute that her husband intentionally and voluntarily drank the alcohol that caused his death. Nor does she contend that some mischance, slip or mishap occurred during his consumption of the whiskey and beer to cause him to consume more than he intended. Although the result of his drinking *1140 was unexpected, the act of drinking was intentional. Georgia law makes it clear that such conduct is not covered by an “accidental means” policy.
Id. See also Continental Assurance Company v. Rothell, 227 Ga. 258, 181 S.E.2d 283 (1971). A reasonable person would have foreseen that driving with a blood alcohol level of .22 grams percent was highly likely to result in injury or death. If Laney or Georgia law applies to this case, the court should enter judgment in favor of the Defendants and against the Plaintiff. Nevertheless, it is also unquestionably true that the ordinary purchaser of an accidental death insurance policy would think that the unintentional and unexpected burning to death as a result of a car wreck constitutes death by accident.
The Eleventh Circuit has clearly held that ERISA preempts state law and authorizes federal courts to create federal common law to implement Congress’ statutory scheme. Branch v. G. Bernd Co., 955 F.2d 1574, 1580 (11th Cir.1992). In this case, the Court is faced with the question of whether to frustrate the statutory scheme of ERISA by adhering to the metaphysical distinction between “accidental means” and “accidental results” that has bedeviled the courts for more than 60 years ....
... The Eleventh Circuit has clearly stated the process for determining ERISA common law.
To decide whether a particular rule should become part of ERISA’s common law, courts must examine whether the rule, if adopted, would further ERISA’s scheme and goals. ERISA has two central goals: (1) protection of the interests of employees and their beneficiaries in employee benefit plans; and (2) uniformity in the administration of employee benefit plans.
Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1041 (11th Cir.1998) (citations omitted). Reading a foreseeability exclusion into the policy would frustrate the Congressional purpose of protecting ERISA plan beneficiaries. It would not contribute to uniformity in the administration of employee benefit plans. A foreseeability exclusion contributes to uncertainty and difficulty of administration. “[A]n insured should not have to consult a long line of case law or law review articles and treatises to determine the coverage he or she is purchasing under an insurance policy.”
74 F.Supp.2d at 1276, 1279.
Accordingly, the District Court concluded “that Allianz applied an incorrect legal standard to the determination of whether Mr. Buce died as a result of an accident.” Id. at 1279.
(C) Finally, the District Court rejected Allianz’s alternative contention that Mrs. Buce’s claim was, in any event, barred by the policy’s intoxication exclusion provision, which read: “The Company shall not be liable for any loss sustained in consequence of the person whose injury is the basis of claim being intoxicated or under the influence of any narcotic unless administered on the advice of a physician.” The District Court found that the 1985 Summary Plan Description, a portion of a plan booklet furnished to Mr. Buce, “contained a list of policy exclusions that did not include an exclusion for injuries due to intoxication.” Id. The 1993 plan booklet contained a Summary Plan Description which did include an intoxication exclusion provision, but the District Court found, on the basis of NSI’s answers to interrogatories, that “the 1985 Summary Plan Description was the only one ever issued to either Mr. or Mrs. Buce,” id. at 1274, with *1141 the result that the 1985 Summary Plan Description was to be treated as the operative one. And as between the 1985 Summary Plan Description and the text of the policy, the District Court, citing our decision in McKnight v. Southern Life and Health Ins. Co., 758 F.2d 1566, 1570 (11th Cir.1985), concluded that “[wjhen a summary plan document conflicts with the plan, the summary controls.” Id. at 1279.
Ill
On appeal, Allianz challenges each of the District Court’s rulings.
The first ruling — that “heightened arbitrary and capricious” review is the proper standard for federal court review of the benefits denial in this case — is, as a matter of law, unassailable, for the reasons cogently stated by the District Court. ASRM — the plan administrator, and author of the initial denial of Mrs. Buce’s claim — was dependent on the patronage of Allianz. And on review of ASRM’s decision, Allianz, in stating through its attorney in the July 11, 1997 letter, that it “ha[d],. .reevaluated this claim,” was exercising its ultimate authority to determine for itself whether payments should be made out of its own assets — an authority which then led it, “upon reconsideration,” to conclude that it “again denies the claim.” This is precisely the conflict-of-interest setting which — under this court’s case law, carefully analyzed by the District Court — calls for “heightened arbitrary and capricious” review.
In its opening brief pn appeal, Allianz undertakes to deflect the District Court’s exercise of “heightened arbitrary and capricious” review by arguing that “notwithstanding a conflict of interest, the heightened arbitrary and capricious test does not apply if the administrator’s interpretation of the plan language is correct.” We think, however, that it is not the correctness of the administrator’s interpretation — namely, that the intoxication exclusion barred Mrs. Buce’s claim — which is chiefly at issue. We think, rather, that what is chiefly at issue is the correctness of the insurance carrier’s interpretation, for that was the final and controlling rationale for the denial of benefits. To be sure, the insurance carrier did invoke the intoxication exclusion provision, but that ground was alternative, and ancillary, to its principal basis for denying Mrs. Buce’s claim— namely, that Mr. Buce’s policy was “an ‘accidental means’ policy which requires that, in the act which preceded the injury, there must have occurred something sudden, unexpected and unforeseen,” and that “Mr. Buce’s injuries were occasioned by his voluntary ingestion of alcohol and were therefore not ‘bodily injuries cause[d] by an accident’ as required by the coverage provisions of the Policy.” The District Court, in the second of its three rulings, rejected that interpretation, holding that “accidental means” doctrine, while good law in Georgia, was not a permissible ingredient of a benefits plan governed by ERISA. To the correctness of that ruling, which is subject to plenary review by this court, we now turn.
The District Court, in the portion of its analysis quoted above (in Part 11(B) of this opinion), noted that Georgia is an “accidental means” jurisdiction, as recognized by this court in Laney v. Continental Ins. Co., 757 F.2d 1190 (11th Cir.1985), and went on to observe that “[i]f Laney or Georgia law applies to this case, the Court should enter judgment in favor of the Defendants and against the Plaintiff.” 74 F.Supp.2d at 1276. However, the District Court, finding limited value in “accidental means” doctrine, concluded that, since the case at bar is not, like Laney, a diversity case, but an ERISA case, the Georgia law of “accidental means” was not controlling. *1142 Specifically, the District Court ruled — correctly — that when a federal court construes an ERISA-regulated benefits plan, the federal common law of ERISA supersedes state law. See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1041 (11th Cir.1998); Todd v. AIG Life Ins. Co., 47 F.3d 1448, 1451 (5th Cir.1995). Finding “accidental means” doctrine to be incompatible with “the developing ERISA federal common law,” 74 F.Supp.2d at 1278, the District Court held that “it is arbitrary and capricious for an insurer to deny a claim based upon an interpretation of ‘accident’ that is not stated in the policy and that is contrary to the expectations of the ordinary insured.” Id. at 1279.
In the portion of the District Court’s opinion quoted at some length in Part 11(B) of this opinion, supra, the District Court referred to “the metaphysical distinction between ‘accidental means’ and ‘accidental results’ that has bedeviled the courts for more than 60 years.” The “more than 60 years” was a reference back to the Supreme Court’s decision in Landress v. Phoenix Ins. Co., 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934). Landress was a pre-Erie[1] diversity case. The decedent died of sunstroke while playing golf. The decedent’s widow sought to recover on two accident insurance policies. One policy provided coverage for death resulting “directly and independently of all other causes from bodily injuries effected through external, violent and accidental means, and not directly or indirectly, wholly or partly from disease or physical or mental infirmity.” The other policy provided coverage for death resulting “from bodily injuries effected directly and independently of all other causes through external, violent and accidental means.” On certiorari, the Court reviewed a judgment of the Sixth Circuit, 65 F.2d 232, affirming the district court’s dismissal of the complaint. The Court affirmed. Speaking through Justice Stone, the Court explained:
Petitioner argues that the death, resulting from voluntary exposure to the sun’s rays under normal conditions, was accidental in the common or popular sense of the term and should therefore be held to be within the liability clauses of the policies. But it is not enough, to establish liability under these clauses, that the death or injury was accidental in the understanding of the average man — that the result of the exposure “was something unforeseen, unsuspected, extraordinary, an unlooked for mishap, and so an accident,” see Lewis v. Ocean Accident & G. Corp., 224 N.Y. 18, 21, 120 N.E. 56; see also Aetna Life Ins. Co. v. Portland Gas & Coke Co., 229 Fed. 552—for here the carefully chosen words defining liability distinguish between the result and the external means which produces it. The insurance is not against an accidental result. The stipulated payments are to be made only if the bodily injury, though unforeseen, is effected by means which are external and accidental. The external means is stated to be the rays of the sun, to which the insured voluntarily exposed himself. Petitioner’s pleadings do not suggest that there was anything in the sun’s rays, the weather or other circumstances, external to the insured's own body and operating to produce the unanticipated injury, which was unknown or unforeseen by the insured ....
This distinction between accidental external means and accidental result has been generally recognized and applied *1143 where the stipulated liability is for injury resulting from an accidental external means .... And injury from sunstroke, when resulting from voluntary exposure by an insured to the sun’s rays, even though an accident, see Ismay, Imrie & Co., v. Williamson [1908] A.C. 437, has been generally held not to have been caused by external accidental means.
291 U.S. at 495-96, 54 S.Ct. 461.
Justice Cardozo dissented. “A cause,” he wrote, “does not cease to be violent and external because the insured has an idiosyncratic condition of mind or body predisposing him to injury .... Here the complaint alleges that the idiosyncrasy was not a physical or mental disease, and that it appeared from autopsy that there was no bodily infirmity or disease which could have been a contributing cause of death. Since the case is here on demurrer, those allegations must be taken as true.” Id. at 498, 54 S.Ct. 461. Cardozo then turned to the contending legal principles as they applied to the case before the Court:
2. Sunstroke, though it may be a disease according to the classification of physicians, is none the less an accident in the ordinary speech of men .... The suddenness of its approach and its catastrophic nature ... have made that quality stand out when thought is uninstructed in the mysteries of science .... Violent it is for the same reason, and external because the train of consequences is set in motion by the rays of the sun beating down upon the body, a cause operating from without.
“In my view this man died from an accident. What killed him was a heatstroke coming suddenly and unexpectedly upon him while at work. Such a stroke is an unusual effect of a known cause, often, no doubt, threatened, but generally averted by precautions which experience, in this instance, had not taught. It was an unlooked for mishap in the course of his employment. In common language, it was a case of accidental death.” Per Loreburn, L. C., in Ismay, Imrie & Co., v. Williamson, supra.
3. The attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian Bog. “Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident.” Halsbury, L. C., in Brinton’s v. Turvey, L.R. [1905] A.C. 230, 233 .... On the other hand, the average man is convinced that there is, and so certainly is the man who takes out a policy of accident insurance.
Id. at 498-99, 54 S.Ct. 461.
In Landress Cardozo stood alone. His elegant, ominous and obscure warning of the menace that lurked in a Serbonian Bog — a type of bog not loeatable in Black’s Law Dictionary or in Words and Phrases[2] *1144 —was lost on his colleagues. But in subsequent decades many state courts — a number of them clearly influenced by Cardozo’s gloomy admonition (e.g., the Colorado Supreme Court, per Chief Justice Burke: “[W]hatever kind of bog that is, we concur,” Equitable Life Assur. Soc. v. Hemenover, 100 Colo. 231, 67 P.2d 80, 81 (1937))—have tended to collapse “accidental means,” “accident,” “accidental result,” “accidental injury,” “accidental death,” and other formulations, into a unitary legal concept pursuant to which “the term ‘accidental’ is equally descriptive of means which produce effects which are not their natural and probable consequences, as it is of means which are wholly unexpected.” Lee R. Russ & Thomas F. Segalla, 10 Couch on Insurance 3d § 139:22 (1998 ed.).
As of today, the jurisdictions, of which Georgia is one, that continue to adhere to “accidental means” as a category of accident insurance liability distinct from, and more restrictive than, other categories of accident insurance liability are in the minority. Id. at § 139:21. But it does not seem to be a small minority. In 1994, the California Supreme Court, in a lengthy opinion by Justice George announcing (over vigorous dissent) continued allegiance to “accidental means,” noted that, “as of 1992, 22 jurisdictions, including Cali-forma, expressly recognized the distinction between ‘accidental means’ and ‘accidental death’ (3 Harnett & Lesnick, [The Law of Life and Health Insurance], § 7.03[1], pp. 7-24 — 7-29; id., (1992 supp.) p. 5), whereas 25 jurisdictions expressly have rejected or repudiated this distinction. (3 Harnett & Lesnick, supra, § 7.06[1], pp.7-112-7-116).” Weil v. Federal Kemper Life Assurance Co., 7 Cal.4th 125, 27 Cal.Rptr.2d 316, 866 P.2d 774, 781 (1994).[3] Justice George also noted that the First Circuit, in an ERISA case—Wickman v. Northwestern Nat. Ins. Co., 908 F.2d 1077 (1st Cir.), cert. denied, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990)—had rejected “accidental means.”
In Wickman, the decedent, Paul Wick-man, fell to his death from a highway bridge to railroad tracks forty or fifty feet below. When last seen, the decedent was “standing on the outside of the bridge’s guardrail, holding on to it with only his right hand.” Id. at 1080. Whether Paul Wickman slipped or jumped could not be determined. After the claim filed by Mary Jane Wickman (the decedent’s widow', and the beneficiary of his group accidental death and dismemberment policy) was denied by the insurance carrier, she brought a diversity action against the carrier in the United States District Court for Massachusetts. Because the group policy was *1145 one in which Paul Wickman had been enabled to participate as an incident of his employment, Mary Jane Wickman’s state law contract claim on the policy was dismissed and the suit went forward not as a diversity case but as a federal question case arising under ERISA. After a bench trial, the magistrate judge handling the case dismissed the suit, concluding that Paul Wickman’s death was not an accident within the meaning of policy terms defining an “accident” as “an unexpected, external, violent, and sudden event.” In the view of the magistrate judge, “Mr. Wick-man knew or should have known that serious bodily injury or death was a probable consequence substantially likely to occur as a result of placing himself outside of the guardrail and hanging on with one hand.” Id. at 1081. On appeal, in addressing the question whether the magistrate judge had correctly determined that the decedent’s death was not an accident within the meaning of the policy, the First Circuit observed that “we, of course, first look at the contract”; but the court found that the contract language definition of “accident” — “an unexpected, external, violent, and sudden event” — was “somewhat less than dispositive.” Id. at 1084. The court explained: “It is undisputed that the fall was external, violent, and sudden, but the parties disagree over whether it was unexpected .... The question comes down to what level of expectation is necessary for an act to constitute an accident; whether an intentional act proximately resulting in injury or only the ultimate injury itself must be accidental.” Id. at 1085. Having framed the question in this way, the court explored the “accidental means”/“accidental result” dichotomy and rejected “accidental means.” “We elect to pursue a path for the federal common law which safely circumvents this Serbonian Bog.” Id. at 1086. Nonetheless, the court went on to determine that the judgment of the magistrate judge was not erroneous: “[W]e conclude that this case is governed under ERISA, and that applying federal common law under ERISA, Paul Wick-man’s death did not constitute an accident within the terms of his group accident insurance policy. Wickman either subjectively expected serious injury, or the evidence was inconclusive as to his subjective expectation. Objectively, he reasonably should have expected serious injury when he climbed over the guardrail and suspended himself high above the railway tracks below by hanging on to the guardrail with only one hand.” Id. at 1089. Thus, whether or not her claim was scrutinized through the prism of “accidental means,” Mary Jane Wickman could not prevail.[4]
*1146 In Wickman, as noted above, the term “accident”, in an ERISA-governed group policy, was defined as an “unexpected, external, violent, and sudden event” — a defínition the First Circuit charitably described as “somewhat less than disposi-tive.” In circumstances of this sort— where the crucial terms of an accident policy are defined with surpassing vagueness, and the policy contains no general *1147 guidance as to the construction of those terms—we think that to deploy the federal common law of ERISA to give some unity to the concept of “accident” is sound judicial policy. Concretely, we think that, in the case before it, the First Circuit was on eminently sound ground in ruling out “accidental means” and focusing instead on the objectively reasonable expectations of a person in the perilous situation that the decedent had placed himself in.
Wickman’s rejection of “accidental means” does not, however, rule the case of Walter Buce. In the case at bar, the vague terms of the policy—“bodily injury caused by an accident ... and resulting directly and independently of all other causes in loss covered by the policy”—are given cognizable doctrinal context by another provision of the policy, the directive that “[t]he Plan is to be interpreted in accordance with the laws of the State of Georgia.” Georgia—as this court held in Laney, supra—is an “accidental means” jurisdiction. Laney was decided in 1985, the year that Walter Buce elected to become a participant in NSI’s Personal Accident Insurance Plan. In Laney the decedent’s widow brought suit, based on her husband’s death from over-consumption of alcohol (“ ‘acute ethanol intoxication (poisoning)’ ”), under a policy providing coverage for “loss ... resulting directly and independently of all other causes from bodily injuries caused by accident.” In affirming the district court’s grant of summary judgment in favor of the carrier, we addressed the meaning of “caused by accident” (the phrase which links Pat Laney and Walter Buce) under Georgia law. We reviewed “accidental means” case law in Georgia and neighboring jurisdictions. We noted that “[Leading commentators on insurance law ... equate ‘caused by accident’ and ‘accidental means.’ ” 757 F.2d at 1192. And we then said: “Finally, grammatical construction suggests that the two terms, ‘caused by accident’ and ‘accidental means,’ are synonymous and not the same as ‘accidental injury.’ In the phrase ‘accidental means,’ the word accidental is an adjective describing the quality of the events precipitating the ultimate result. The focus is on the occurrence or happening which produces the result, not the result itself. Similarly, in the phrase ‘bodily injuries caused by accident,’ the qualifier limits the cause of the harm to those circumstances where the result, i.e., the injury, is due to an unexpected, unforeseen or unintentional event.” Id. In the case at bar, the July 11, 1997 letter of Allianz’s attorney to Patricia Buce’s attorney, John Robinson, giving the reasons for the carrier’s denial of Mrs. Buce’s claim, is in harmony with this court’s explication in Laney of Georgia law. Wrote Allianz attorney Douglas Campbell: “This is an accident policy which, as applicable to this particular claim, provides payment of benefits where loss of life is due to bodily injury caused by an accident and resulting directly and independently of all other causes in death. As such, it is an ‘accidental means’ policy which requires that, in the act which preceded the injury, there must have occurred something sudden, unexpected and unforeseen.” Thus, in the light of the express directive of the policy that it “is to be interpreted in accordance with the laws of the State of Georgia,” we conclude that Allianz’s decision to deny the claim made by Patricia Buce survives “enhanced arbitrary and capricious” review.[5]
*1148 Citing three cases that have declined to enforce choice-of-law provisions in ERISA-regulated plans, Judge Carnes, in his concurring opinion, raises—but does not undertake to resolve—the question whether the common law of ERISA operates preemptively to preclude enforcement of the agreement of the parties to the insurance contract to utilize principles of Georgia law as the standards by which to determine the carrier’s liability. There is, of course, no question that ERISA’s preemptive authority sweeps broadly to preclude the application of provisions of state law (statutory or decisional) that would undercut the uniform implementation of ERISA’s text or its attendant case law. See Egelhoff v. Egelhoff — U.S. -, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001). The rationale of ERISA’s preemption of otherwise applicable state law mandates is the rationale that underlies all federal preemption—namely, that in enforcing federal law the directives of the supreme federal sovereign take precedence over directives of the not-supreme state sovereign. But when private contracting parties formulate a choice-of-law provision that, with a view to defining liability, incorporates state legal doctrines, those doctrines are not emanations of state authority, they are simply a convenient shorthand for what the private contracting parties wish to agree to. The pertinent question to be addressed with respect to such a choice-of-law provision is, therefore, not a question of the possible irreconcilability of directives issuing from two different sovereignties—one federal and one state. The pertinent question, in short, is not one of “preemption” in the conventional sense of that term. The pertinent question is whether the principles of liability agreed upon by the parties are inconsistent with the language of ERISA or the policies that inform that statute and animate the common law of the statute.
In the case at bar, we have been pointed to no ERISA statutory language, and no cases formulating the common law of ERISA, which suggest that the agreement of the parties to utilize Georgia doctrine would be subversive of ERISA policy.[6] From Cardozo onward, “accidental *1149 means” has been the subject of formidable criticism. But many jurisdictions — Georgia among them — continue to adhere to the doctrine. Given that the Personal Accident Insurance Plan at issue in this case was designed for the employees of a Georgia company, it is difficult to see that the parties’ decision to utilize Georgia doctrine was inappropriate. “Where a choice of law is made by an ERISA contract, it should be followed, if not unreasonable or fundamentally unfair.” Wang Laboratories, Inc. v. Kagan, 990 F.2d 1126, 1128-29 (9th Cir.1993).
The doctrine of “accidental means” may no longer be fashionable, but its use in this Georgia benefits plan can hardly be characterized as “unreasonable”, let alone “fundamentally unfair”. Accordingly, the District Court was without authority to determine that it should be disregarded. “The parties to accident insurance contracts have the right and power to contract as to the accidents and risks for which the company shall and shall not be liable, subject to the restraints of public policy, and the courts may not make new or different contracts for them.” 10 Couch on Insurance 3d § 139:8 (1998 ed.) (footnotes omitted).
Conclusion[7]
For the reasons given above, the judgment of the District Court is REVERSED and the cause REMANDED with directions to enter judgment dismissing the suit of plaintiff-appellee Patricia Buce against defendant-appellant Allianz.
REVERSED and REMANDED.

. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

. "Serbonian Bog” is "[John] Milton’s name for Lake Sarbonis in Lower Egypt, a marshy tract (now dry) covered with shifting sand. Hence used allusively.” II The Compact Edition of the Oxford English Dictionary 2735 (Oxford University Press 1971). Milton’s reference to the Bog appears in the sentence that comprises lines 587-95 of Book II of Paradise Lost:
Beyond this flood a frozen Continent Lies dark and wilde, beat with perpetual storms
Of Whirlwind and dire Hail, which on firm land
Thaws not, but gathers heap, and ruin seems
Of ancient pile; all else deep snow and ice, A gulf profound as that Serbonian Bog Betwixt Damiata and mount Casius old, Where Armies whole have sunk: the parching Air
Burns frore, and cold performs th’ effect of Fire.
*1144 The Poetical Works of John Milton, 215 (W. Skeat ed., Oxford University Press, 1938).
It appears that insurance law is not the only legal realm that may have within its confines a Serbonian Bog. See Texas v. Cobb, 532 U.S. -, 121 S.Ct 1335, 149 L.Ed.2d 321 (2001), in which Justice Breyer, in dissent, characterized a constitutional test adopted by the Court, in overturning the Texas Court of Criminal Appeals' reversal of a murder conviction, as so amorphous as to be likely to prove "the criminal law equivalent of Milton’s 'Serbonian Bog ... Where Armies whole have sunk.' " Id. at - 121 S.Ct. 1335.

. Justice Mosk, joined by Justice Kennard, filed a dissent in Weil substantially longer than the court's lengthy opinion; the dissent urged abandonment of "accidental means." Both the dissent and the opinion of the court treated Cardozo's Landress dissent as a central ingredient of the jurisprudential debate. The focus of the Weil debate was whether death resulting from an overdose of cocaine was covered by a life insurance policy's “Additional Accidental Death Benefit” rider. The rider provided coverage for "loss of life as the direct result of bodily injury, independent of all other causes, effected solely through external, violent and accidental means.”

. In 1994 — four years after Wickman — the United States District Court for the Western District of Arkansas, citing Wickman, stated that ‘‘[t]he means-result distinction has been rejected in ERISA cases.” Parker v. Danaher Corporation, 851 F.Supp. 1287, 1292 (W.D.Ark.1994). Timothy Parker died of "autoerotic asphyxiation” — the unintended consequence of what is apparently a not uncommon "practice... described as an act of autoerotic stimulation by means of a noose tightened around the neck for the purpose of temporarily restricting the supply of oxygen to the brain in an attempt to intensify the sensations of masturbation." Id. at 1289. Mary Faye Parker (the decedent's mother and his beneficiary under an employer-provided group life insurance policy) was paid $10,000 of standard life insurance benefits, but her claim for an additional $10,000 under the accidental death provisions of the policy — death pursuant to "bodily injury caused by an accident.. .resulting directly and independently of all other causes in loss covered by this policy” — was rejected. On de novo review the district court found in plaintiff's favor. "We agree with the Wickman court that the means-result distinction should not be adopted in ERISA cases. However, we find that the Wickman subjective/objective analysis sheds little light in an area of the law already unduly complicated by reference *1146 to various artificial distinctions. Rather, we believe it more appropriate to accord the term 'accident' its natural meaning .... In this case, it is undisputed that the insured did not expect to die as a result of performing the autoerotic act.... [W]e believe that in the common understanding of man Timothy Parker’s death would be regarded as accidental.” Id. at 1295. Thus, the Parker court, following its ERISA-based rejection of "accidental means,” went on to conclude that the denial of Mary Faye Parker’s accidental death benefits claim was erroneous. But— quite apart from the fact that the events leading to the death of Timothy Parker were entirely unlike the events leading to the death of Walter Buce — Parker sheds little light on the case at bar for the reason that Parker was an instance of de novo review of the denial of a benefits claim.
Unlike Parker, Wickman, as we have noted, was not a case in which the rejection of "accidental means” analysis had impact on the court's decision, for the First Circuit ruled that Paul Wickman's death was not an "accident” even under the broader concept of "accident” that the court deemed applicable. We think that the vital aspect of the First Circuit's approach in Wickman is reflected in the manner in which the Seventh Circuit built upon Wickman in Cozzie v. Metropolitan Life Insurance Company, 140 F.3d 1104 (7th Cir.1998). Cozzie is an ERISA accidental death benefits case essentially indistinguishable on its facts from the case at bar:
On November 6, 1994, Mr. Cozzie was killed in a car accident. According to investigators, Mr. Cozzie's vehicle was found overturned in a field, where it had come to rest, after missing a curve in the road, striking an embankment and rolling over three times. Mr. Cozzie had a blood alcohol level of .252%. This amount is more than 2 + times the legal limit under Illinois law at tire time of the incident. The cause of death stated in the coroner's report was asphyxiation as a result of the car’s resting on Mr. Cozzie. There were no witnesses to the accident other than Mr. Cozzie's impaired condition.
Id. at 1106 (footnote omitted).
The district court, applying "arbitrary and capricious” review, granted summary judgment in favor of the insurance carrier. The Seventh Circuit affirmed. Drawing on Wick-man, the Cozzie court said:
Our colleagues in the First Circuit, in a thoughtful survey of the difficulties encountered by modern courts in developing a limiting principle to the term “accident,” have suggested that, in giving meaning to the term "accident,” we first ask whether the insured believed that the conduct at issue would result in the sort of injury that was sustained. See Wickman v. Northwestern Nat. Ins. Co., 908 F.2d 1077, 1088 (1st Cir.), cert. denied, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990). If the insured did not believe that the result would occur, we must consider whether such an estimation can be considered reasonable. If the expectations were objectively unreasonable, then injuries from death resulting therefrom are not accidental. Id.
Employing this approach to defining "accident,” other courts have reached the conclusion that a death that occurs as a result of driving while intoxicated, although perhaps unintentional, is not an "accident” because that result is reasonably foreseeable. See Miller v. Auto-Alliance Int’l, Inc., 953 F.Supp. 172, 176 (E.D.Mich.1997) (upholding MetLife’s denial of AD&D benefits because definition of "accident” used' — that death or injury resulting from driving while intoxicated reasonably should have been expected — was not arbitrary and capricious); Fowler v. Metropolitan Life Ins. Co., 938 F.Supp. 476, 480 (W.D.Tenn.1996) (same); cf. McLain v. Metropolitan Life Ins. Co., 820 F.Supp. 169, 178 (D.N.J.1993) (upholding MetLife's denial of AD & D benefits and its definition of "accident” as not arbitrary and capricious in finding that death resulting from cocaine use was not accidental because insured reasonably should have expected death to occur).
Id. at 1109-10.

. In the case at bar, the carrier’s determination that Walter Buce's death was not an "accident” would clearly have satisfied the "arbitrary and capricious” review exercised by the Seventh Circuit in Cozzie v. Metropolitan Life Insurance Company, 140 F.3d 1104 (7th Cir.1998), the factually almost congruent case discussed in footnote 4, supra, for the *1148 reasons cogently articulated by the Cozzie court. Moreover, we think it strongly arguable that the Cozzie analysis, applied to the case at bar via the requisite "enhanced arbitrary and capricious” review, would likewise have led to the conclusion that the carrier's denial of benefits was warranted. However we need not resolve that issue, since, for the reasons given in the text of this opinion, we conclude that the carrier was warranted in denying Patricia Buce’s claim on the basis of its "accidental means” analysis.

. The cases cited in Judge Carnes’s concurring opinion—Prudential Insurance Company of America v. Doe, 140 F.3d 785 (8th Cir.1998); Morton v. Smith, 91 F.3d 867 (7th Cir.1996); and In re Sears Retiree Group Life Insurance Litigation, 90 F.Supp.2d 940 (N.D.Ill.2000)—contain language dismissive of choice-of-law provisions found to contravene aspects of the common law of ERISA.
In Prudential Insurance the Eighth Circuit held that a choice-of-law provision invoking Illinois law, and hence the Illinois doctrine of contra proferentem, could not obviate application of a previously established circuit ruling that a Missouri contra proferentem "rule of construction violates the provisions of ERISA," Brewer v. Lincoln National Life Insurance Co., 921 F.2d 150, 153 (1990).
In Morton v. Smith tire Seventh Circuit, in dictum, rejected an argument that ERISA trustees would be bound by a choice-of-law provision to exercise their discretionary authority in conformity with Illinois law, had such a provision been contained in the plan, which the court found it had not; but the court also went on to "note that the rule of contract interpretation [i.e., reference to state law] that Morton invokes here can sometimes be relevant to the interpretation of an ERISA benefit plan”. 91 F.3d at 871 n. 1. The court then pointed to its prior ruling in Phillips v. Lincoln National Life Insurance Co., 978 F.2d 302, 311-313 (7th Cir.1992), that application of the Illinois contra proferentem rule in the *1149 interpretation of an ERISA-regulated plan was compatible with the common law of ERISA — a construction of the common law of ERISA which, as the Eighth Circuit noted in Prudential Insurance, is in conflict with the Eighth Circuit rule announced in Brewer and reaffirmed in Prudential Insurance.
Sears Retiree was a class action alleging breach of an ERISA-regulated life insurance plan through reductions of benefits for retired employees. The defendants invoked reservation of rights clauses in the policy as justifying the benefit-reductions, and the court noted that, "[i]n case after case, in this circuit and others, courts have held that employee benefit plans containing reservation of rights clauses do not give rise to vested welfare benefits.” 90 F.Supp.2d at 944-45. The plaintiffs countered that Illinois law barred reductions in retiree life insurance benefits, and contended that Illinois law, was controlling by virtue of a policy provision describing the policy' as "an Illinois contract” which “will be construed in accordance with the laws of that jurisdiction.” 90 F.Supp.2d at 950. The court, citing Tormey v. General American Life Ins. Co., 973 F.Supp. 805 (N.D.IIll.1997), and Morton v. Smith, rejected plaintiffs' contention.
Each of the foregoing cases illustrates a circumstance in which a court found that application of a particular state law rule, even if agreed to by the parties, would not be compatible with the law of ERISA. But none of these discrete ERISA cases — and no other case of which we are aware — tends to establish the proposition that application of Georgia’s "accidental means” doctrine to the Georgia-based ERISA benefits dispute at bar would undercut established principles of ERISA law. As noted above, in Morton v. Smith the Seventh Circuit pointed out that the contracting parties' reliance on state law doctrines "can sometimes be relevant to the interpretation of an ERISA benefit plan.” No showing has been made that the case at bar is not such an instance.

. In view of our determination that Allianz's denial of benefits based on Georgia’s "accidental means” doctrine was warranted, we have no occasion to consider whether, on the facts of this case, Allianz's denial of benefits was, in the alternative, properly based on the policy's intoxication exclusion provision.